## Pennsylvania Securities Commission v. Robinson Development Corp.

*David Turets,* for appellant.

*Frederic G. Antoun,* Deputy Attorney General, and *Thomas D. McBride,* Attorney General, for appellee.

HERMAN, J., March 16, 1959.—This case comes before us by way of an appeal by Robinson Development Corporation, appellant, from an adjudication of the Pennsylvania Securities Commission. The appeal was taken under authority contained in the Administrative Agency Law of June 4, 1945, P. L. 1388, 71 PS §1710.1 et seq., and in conformity with Pa. R. C. P. 1 to 13 inclusive.

We are principally concerned here with the construction of section 2(*f*) (8) and the proviso following section 2(*f*) (17) of The Pennsylvania Securities Act of June 24, 1939, P. L. 748, as reënacted by the Act of July 10, 1941, P. L. 317, 70 PS §31 et seq.

This act, as so aptly said by Judge Neely of this court in Pennsylvania Securities Commission v. Sheridan, 65 Dauph. 104, 107 (1953), "is a 'Blue Sky Law' of the type known as a 'Fraud Act,' that is to say, it has for its purpose the protection of the investing public from fraud in the sale of securities. To accomplish this purpose, it registers the persons engaged in the sale of securities as dealers and salesmen." It further enumerates the things that a dealer and salesman may or may not do, and provides penalties for violations by such persons. In defining the word "dealer" it is shown in section 2(*f*) of the act that a corporation

selling its own stock through its officers, or directors, or agents may be a dealer, but this section further sets forth a number of types of transactions which do *not* [1] constitute a person a dealer within the meaning of the act, and therefore not subject to regulation, and subdivision (8) thereof describes the type of transaction with which we are here involved. That subdivision provides that a person is not a dealer when the transactions in which he engages are:

"Sales wherein the issuer, a company organized under the laws of this State . . . *disposes of its own securities in good faith and not for the purpose of avoiding the provisions of this act for the sole account of the issuer*, without any commission or fee and at a total expense of not more than three per centum of the proceeds realized thereon, *and where no part of the issue is used, directly or indirectly, in payment for patents, services, good will,* or for property located outside of this State": 70 PS §32.

And then further in section 2(*f*) of the act, after subdivision (17), it is said:

"Provided, however, That the exemptions granted by subdivisions (8), (9) and (10) of this subsection (f) shall not be effective to exempt any person as a 'dealer' until five (5) days after such person shall have filed in the office of the commission or mailed to the commission at Harrisburg, Pennsylvania, by prepaid registered mail, a statement, in such form as the commission may prescribe, of the facts relied on by such person to bring the proposed transaction within the terms of one or more of said subdivisions (8), (9) or (10) and *shall not be effective if the commission shall have notified such person that exemption has been denied": 70 PS §32.

In the instant case Robinson Development Corporation, a domestic corporation, was incorporated on July

---

[1] Italics throughout supplied, unless otherwise indicated.

6, 1956, and the form required by the commission to secure the exemption pursuant to the above section was filed by it on July 25, 1956. On this form the preamble recites that it is a "Statement of facts relied on to bring the sale of securities within the terms of subdivision (8) of subsection (f) of Section 2 of 'The Pennsylvania Securities Act,'" and then quotes the section, the pertinent parts of which appear above.

There then follows on the form 12 numbered paragraphs, some containing blanks to be filled in by the applicant, which when completed include its name, the date of its incorporation, the stock which it proposes to issue and sell, the names of its officials, a statement that the securities are to be issued for the sole account of the corporation applying for the exemption, a statement that no commission or fee is to be paid to any person or organization for or in connection with the offer or sale of said securities, a statement of the total expenses of the corporation in connection with the sale of said securities, the minimum price at which the shares will be sold, a statement that if any of the securities are to be sold for consideration other than cash, then the description of such property to be received and its minimum fair market value shall be set forth, a statement that the cash or other consideration to be received by the corporation from the sale of the securities will not be employed directly or indirectly for the purchase of patents, services, good will or property located outside of Pennsylvania, from any person to whom said securities are sold, and a statement that the securities are to be disposed of by the corporation in good faith and not for the purpose of avoiding the provisions of The Pennsylvania Securities Act.

Appellant stated on this form that 300,000 shares of common stock at $1 par value would be issued and offered for sale; that *all* of it was to be sold for cash

at the minimum price of $1 per share and that *no part* was to be sold for a consideration other than cash.

Paragraphs 8 and 10 of the form which are particularly applicable here read as follows:

"8. The cash or other consideration to be received by the undersigned from the sale of said securities will not be employed directly or indirectly for the purchase of patents, services, good will, or property located outside of Pennsylvania, from any person to whom said securities are sold."

"10. Said securities are to be disposed of by the undersigned in good faith and not for the purpose of avoiding the provisions of 'The Pennsylvania Securities Act.' "

The form, after having been completed by appellant, was then executed by the corporation, and the truth of the facts therein was sworn to by its secretary.

On the strength of this application, on August 11, 1956, the exemption was granted, and then, on or about August 14, 1956, 60,000 shares of the common stock of the corporation were issued to Louis M. Robinson and his wife, or as later stated in Mr. Robinson's testimony, 40,000 shares to Louis M. Robinson and his wife, Emma, 10,000 shares to Maurice Robinson, a brother, and 10,000 shares to M. R. Lloyd, a sister, as his nominees. The only consideration moving to the Robinson Development Corporation for these shares was variously testified by Robinson to be the right "to assemble and distribute the Robinson patents," the "exclusive rights for assembling and developing this mechanism in the State of Pennsylvania," the "exclusive rights to assemble and distribute this product in the State of Pennsylvania," "a license to assemble it and sell the finished product," "the franchise" and the "exclusive right to receive all profits from the sale of this device in the State of Pennsylvania."

Louis M. Robinson had testified that he was the inventor of, among other things, a skid control device, which, according to his claims, when attached to automobiles and trucks, would enable the operator to avoid skids and to get out of snow drifts and off icy roads. It was never clearly shown whether the patent for this device had actually been issued or only applied for, but it does appear that "L. Robinson" had, in April of 1957, received at least two patents, and at that time several others were pending.

It was difficult to wend one's way through the labyrinth of corporations and fictitious names under which Robinson and other members of his family operated the business. In addition to Robinson Development Corporation, here involved, there was also Robinson Enterprises, a fictitious name, Robinson Purchasing Company, Robinson Skid Control Associates, Inc., Skid Control Purchasing, Inc., and perhaps other domestic corporations.

At one point in his testimony Robinson stated that he owned the patents, at another point that Robinson Skid Control Associates, Inc., owned or controlled them, and at still another point that Robinson Enterprises had some interest in them, but that he, Louis M. Robinson, was the same as Robinson Enterprises. In any event, three days after the exemption was granted, the 60,000 shares of stock were issued to Louis M. Robinson or his nominees for something in connection with the patents, and no cash was paid to the corporation for their issue, all of which was directly contrary to the sworn statements on the form and to the requirements of section 2(f)(8) if the company would avoid registration as a dealer.

Robinson testified that close to 250,000 shares of the stock were either issued or subscribed for, that it was all paid for by cash and that none was issued for good will. Later in his testimony he acknowledged

that some of the stock was issued to persons who had previously loaned *him* money, perhaps as much as $80,000, in satisfaction of his debts to them, and, of course, the 60,000 shares previously mentioned were issued for the patent rights.

Of these 60,000 shares of stock, Robinson admitted that he had sold 2,700 shares, some for $5 per share and some for $10 per share, all prior to December 1956, and that then, under date of March 6, 1957, he had mailed 200 to 300 copies of a letter soliciting purchasers for the balance of the 60,000 shares. In this letter, which was read into evidence, he stated, what the commission found to be false, that the demand for the stock was so great that the price jumped from $1 to $5, and then to $10 per share, and that "the remaining balance of the participating issue [would][2] be selling at $20 to $25 by July 1, 1957," that the company "should be in production at that time," that the company had "thousands of available orders to be processed" and that the company was "fully financed and able to pay all necessary expenses to get into production on a limited basis."

Although we are not called upon to decide it in these proceedings, we are convinced that under The Pennsylvania Securities Act these false statements amount to fraud.

In view of our ultimate conclusion in this matter, we deem it unnecessary to determine now whether the temporary suspension of the exemption on May 3, 1957, or the telegraphic reasons for the permanent revocation sent to appellant on August 28, 1958, were valid exercises of the commission's power.

After the hearings had been concluded on August 27, 1957, the Securities Commission issued its adjudication, over the signature of the secretary of the com-

---

[2] Brackets supplied.

mission, and supported by findings of fact and conclusions of law. By this adjudication the Pennsylvania Securities Commission permanently and finally revoked the exemption heretofore granted to appellant.

Robinson Development Corporation's exceptions to the adjudication can be divided into two classes: First, that the requisites of due process were not observed by the Pennsylvania Securities Commission in the procedure before it; and secondly, that even if due process was followed, the commission had no authority under the law to take the action that it took in revoking the exemption previously granted.

We shall deal with the due process question first.

The Pennsylvania Securities Act, supra, as far as procedure is concerned, provides that all testimony taken at any hearing before the commission shall be reported stenographically, and that a full and complete record shall be kept of all proceedings before the commission on any hearing or investigation. It further provides that all the decisions of the commission shall be in writing, signed by the secretary of the commission under its seal, that it shall fully state the grounds therefor and that on appeal, mere technical irregularities in the procedure of the commission shall be disregarded.

The Administrative Agency Law, supra, under which the appeal in this case was taken, sets forth in greater detail the proper procedure to be followed in actions before certain enumerated governmental agencies, among which is the Pennsylvania Securities Commission. This act defines "adjudication" and states that no adjudication shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard, that all testimony shall be stenographically recorded and that a full and complete record shall be kept of the proceedings.

It further provides that the agencies shall not be bound by technical rules of evidence at their hearings, that all relevant evidence of reasonable probative value may be received and that reasonable examination and cross-examination shall be permitted.

All parties under this act shall be afforded opportunity to submit briefs prior to adjudication, and oral argument upon substantial issues may be heard.

Section 34 of this same act, 71 PS §1710.34, states that:

"All adjudications shall be in writing, shall contain findings and the reasons for the adjudication, and shall be served upon all parties or their counsel personally, or by mail. If service is made by mail the date of mailing shall be the date of service."

We have very little difficulty in finding that the requisites of procedural due process were observed by the Pennsylvania Securities Commission here. There was not only one, but three hearings held, and on each occasion appellant had notice thereof, and at each hearing a different counsel appeared on its behalf. Louis M. Robinson, the chairman of the board of directors of Robinson Development Corporation, appeared and gave testimony at two of these hearings. All witnesses were sworn, all of the testimony was taken down stenographically and a full and complete record was made. The right of cross-examination was always available and exercised, and there is certainly nothing in the record to indicate that had appellant wished, he could not have submitted briefs or given oral argument, and indeed, at the second and third hearings counsel for appellant presented extended oral arguments. There does not appear to have been any request by appellant for any additional argument or filing of briefs at any time. In fact, on a number of occasions Mr. Gold, counsel for the commission, and on some occasions members of the commission them-

selves, stated unequivocally that they wanted to give Robinson Development Corporation every opportunity to present any evidence that it cared to present and to exercise all of its rights.

The hearings were held over a period from April 16, 1957, to August 13, 1957, a period of approximately four months, and although no formal charges were made at the outset, there is no doubt in the court's mind that appellant knew, at all times, the things with which it was charged.

Although the record fails to disclose the manner in which Robinson Development Corporation and Louis M. Robinson, chairman of the board of directors thereof, received their notice of the first hearing, nevertheless, the record does show that at this hearing, on April 16, 1957, there were present Frank Happ, chairman of the commission, Elizabeth Zeidman and Warren Mickle, members of the commission, Joseph E. Gold, Deputy Attorney General, counsel for the commission, William M. Parker of Pittsburgh, attorney at law, counsel for appellant, and Louis M. Robinson, chairman of the board of appellant, who testified extensively.

Before any testimony was taken, Mr. Gold stated for the record:

"This Commission has called this hearing to determine whether the exemption granted to Robinson Development Corporation on or about July 25, 1956, should be revoked for reasons which will be developed during the course of this hearing."

Louis M. Robinson was then duly sworn, and no objection was made by anyone that there had been inadequate notice or that the corporation did not know with what it was charged.

At the beginning of the second hearing held on May 15, 1957, Mr. Gold stated in more detail to Mr. Robin-

son and his counsel the charges with which appellant was faced.

In Byers v. Pennsylvania Public Utility Commission, 176 Pa. Superior Ct. 620 (1954), the court, quoting from an earlier case, said, at page 624:

" '. . . it is the duty of the administrative boards to hold fair and open hearings and to give notice so that those interested may have an opportunity to be heard and the "rudiments of fair play" be observed.' "

And in W. J. Dillner Transfer Co. v. Pennsylvania Public Utility Commission (No. 1), 175 Pa. Superior Ct. 461 (1954), the court held that where appellant was fully aware of the issue, he could not then complain that he was denied procedural due process on that ground, and the court further pointed out that appellant had a full opportunity at hearings to introduce any evidence that he cared to.

We have examined all of the cases cited by appellant in its brief, as well as many others, and we are convinced from the statute law involved and all of the case law examined that procedural due process was here adequately observed.

Closely allied with the objection that due process was not followed was the objection that the adjudication of the commission is not supported by substantial evidence.

Section 44 of the Administrative Agency Law, supra, provides, in part, that the court shall affirm the adjudication of the commission unless it shall conclude that any finding of fact made by the agency *and necessary to support its adjudication* is not supported by substantial evidence.

We have carefully studied all of the testimony, and along with it the findings of fact contained in the commission's document dated August 27, 1957, which included the final adjudication, and while it is certainly true that a number of the findings of fact are not sup-

ported by substantial evidence, we are of the opinion that such findings were not necessary to the commission's order, and therefore it was immaterial that they were not supported.

As we view the case, the order of the commission is simply that the exemption heretofore granted to Robinson Development Corporation under subdivision (8), subsection (f), section 2, of The Pennsylvania Securities Act is permanently and finally revoked, and the only fact which needs to be established to support that action is that Robinson Development Corporation no longer comes within the terms of the exclusionary part of the subsection (f), hereinbefore quoted, which exempts a corporation from the classification of dealer when selling its own securities in a certain manner.

It seems to us that the issuing of 60,000 shares of the stock of the Robinson Development Corporation to Robinson and his wife or their nominees for the transfer to the corporation of a "license" to exercise certain rights under patents, all of which was clearly established by the testimony, is a sufficient finding of fact on which to base the commission's order, unless such order is, as appellant argues, contrary to law, and this matter will be subsequently discussed.

Regardless of what name is used for it, we can reach no other conclusion but that the 60,000 shares were issued either directly or indirectly for payment for patents. Black's Law Dictionary, Fourth Edition, defines "Patent" as "a grant made by the government to an inventor, conveying and securing to him the exclusive right *to make, use* and *sell* his invention for a term of years", and the consideration moving to Robinson Development Corporation seems to us to have been to make, use and sell the skid control invention.

The findings of fact, which in our opinion are supported by substantial evidence, go farther than this, however, and show not only that the corporation issued

stock directly or indirectly in the payment for patents and services, but established further that the corporation disposed of at least these 60,000 shares of stock not in good faith, and in a manner that appeared to be for the purpose of avoiding the provisions of this act.

All of the testimony taken came from two witnesses, namely, Louis M. Robinson, chairman of the board of directors of Robinson Development Corporation, and Arthur J. Spragg, investigator for the Pennsylvania Securities Commission, who was called by the Robinson Development Corporation, and, although the several counsel for Robinson Development Corporation attempted to convince the commission that the corporation and its chairman were open and aboveboard, and completely cooperative, we feel that this was not the case. The testimony of Mr. Robinson in many respects was fraught with contradictions, evasions, refusals to testify and half-truths.

Had it been known to the commission at the time the form for the exemption had been filed, that shares were to be issued for patents, or that the issuance of 60,000 shares would not be in good faith, it is clear that under section 2 ($f$) (8) of The Pennsylvania Securities Act the exemption could have been and would have been denied. Nevertheless, appellant now contends that once an exemption is granted, no matter how wrong, it can never be revoked. We think that such an interpretation of the law could lead to the perpetration of great fraud on the public, and would be directly contrary to the intent of the legislature in passing the act.

It is our judgment that the Pennsylvania Securities Commission can revoke an exemption previously granted. It is true, as appellant argues, that The Pennsylvania Securities Act does not in so many words say that the board can revoke the exemption, but it seems

to us that such power as this is a necessary corollary to the specific power given to the commission to deny an exemption when certain requirements are not met.

It has repeatedly been said by our appellate courts that this act is a remedial one and that its purpose is to protect the investing public: Commonwealth v. Summons, 157 Pa. Superior Ct. 95 (1944) ; Commonwealth v. Yaste, 166 Pa. Superior Ct. 275 (1950). The protection which this act affords the investing public is the protection against the fraud which unscrupulous persons might attempt to impose upon the public in the sale of securities, and therefore the act is entitled to a liberal construction. As stated by Judge Hirt in Commonwealth v. Yaste, supra, at page 277:

". . . courts may put a literal construction on a penal clause and a liberal construction on a remedial clause in the same statute. Commonwealth v. Shaleen, 215 Pa. 595, 64 A. 797; Alford v. Raschiatore, 163 Pa. Superior Ct. 635, 63 A. 2d 366. The Pennsylvania Securities Act is remedial legislation. Its primary purpose is to protect the investing public. The Act contemplates an investigation to determine whether the securities are being offered to the public honestly and in good faith without any intent to deceive or defraud. Commonwealth v. Summons, 157 Pa. Superior Ct. 95, 41 A. 2d 697. . . . And *the clear intent of the Act is not to be defeated by a too literal reading of words without regard to their context and the evils which the Act clearly was designed to correct.* Even the canon of strict construction of a penal statute is not an inexorable command to override common sense and evident statutory purpose. As was said in United States v. Gaskin, 320 U. S. 527, 530, 64 S. Ct. 318, 319, 88 L. Ed. 287: '[the canon] does not require distortion or nullification of the evident meaning and purpose of the legislation'. 'Nor does it demand that a statute be given the "narrowest meaning"; it is satis-

fied if the words are given their fair meaning in accord with the manifest intent of the lawmakers': United States v. Brown, 333 U. S. 18, 68 S. Ct. 376."

We are convinced that the legislature having in this act specifically provided that the commission might deny the exemption, the clear intent was, that having once granted an exemption, the commission for proper cause could certainly revoke it.

We are aided in this construction of the section, if indeed we needed any aid, by many authorities. 50 Am. Jur. §229, p. 216, states:

". . . a statute may be extended beyond the precise words used in the law, and words or phrases may be enlarged, where that is necessary to obviate repugnancy and inconsistency, and give effect to the manifest intention of the legislature, as discovered by the application of sound principles of interpretation, and to carry out the general scope and purpose of the act."

50 Am. Jur. §240, p. 232, states:

"The courts are not always confined to the mere letter of the law, or to the literal or strict meaning of statutory terminology. It often happens that the true intention of the law-making body, though obvious, is not expressed by the language employed in a statute when that language is given its literal meaning. In such case, the carrying out of the legislative intention, which is the prime and sole object of all rules of construction, can only be accomplished by departure from the literal interpretation of the language employed. Hence, it is a general rule that the manifest intent of the legislature will prevail over the literal import of the words."

50 Am. Jur. §242, p. 237, further states:

". . . where a statute grants a right or imposes a duty, it also confers by implication every particular power and every reasonable means necessary for the exercise of the one or the performance of the other."

The Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §501 et seq., is also authority for such construction. Section 51, 46 PS §551, provides, in part, that when the words of the law are not explicit, the intention of the legislature may be ascertained by considering, among other matters, the occasion and necessity for the law, the circumstances under which it was enacted, the mischief to be remedied and the object to be attained. Taking all of these matters into account, and further that the legislature intends to favor the public interest as against any private interest (section 52, 46 PS §552), and that the provisions of a law such as this one are to be liberally construed to effect their objects and to promote justice (46 PS §558), we must conclude that the intent of the legislature was that the exemption once granted might be revoked.

If we were to hold, as appellant would have us do, we would most assuredly be putting a stumbling block in the way of the commission in the administration of the act. Any unscrupulous person intending to fleece the public by sales of worthless stock could then, by false affidavit, obtain an exemption and thereafter sell his stock without any restrictions, save that of the injunctive process in equity.

We believe the thought of Judge Ross, expressed in Commonwealth v. Fernau, 175 Pa. Superior Ct. 570 (1954), in which he was construing another section of this same act, is particularly apposite here. He there said, and we believe it true here also, that it would indeed be a perversion of the section of the law involved to construe it in such a way that it would operate to frustrate the legislative intent.

In any event, as an appellate court, we should not interfere with the decision of the commission unless there is a flagrant abuse of its power, or an arbitrary or capricious disregard of evidence, or a clear violation of a positive law, or a violation of appellant's consti-

tutional rights. See Fleishmann's Vienna Model Bakery v. Torquato, 12 D. & C. 2d 490; State Real Estate Commission v. Schlechter, 70 Dauph. 287 (1957) ; Dormont Borough Appeal, 180 Pa. Superior Ct. 550 (1956), and Administrative Agency Law, supra, sec. 44, 71 PS §1710.44. There is nothing in the instant case that would move us to disturb the adjudication of the commission, and we accordingly enter the following

### Order

And now, to wit, March 16, 1959, it is ordered, adjudged and decreed that the order of the Pennsylvania Securities Commission revoking the exemption granted to Robinson Development Corporation under subdivision (8) of subsection (*f*) of section 2 of The Pennsylvania Securities Act, is hereby affirmed, and the appeal of Robinson Development Corporation dismissed.